## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

—————————————————————
                                              )
**MALDA J. BROWN,**                           )
                                              )
        **Plaintiff,**                        )
                                              )
        **v.**                                )     **Civil Action No. 08-1110 (ESH)**
                                              )
**KAREN GORDON MILLS, Administrator,**        )
**U.S. Small Business Administration,**       )
                                              )
        **Defendant.**                        )
—————————————————————)

## <u>MEMORANDUM OPINION</u>

Plaintiff Malda Brown has sued the United States Small Business Association ("SBA") for retaliation under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. §§ 2000e-2000e-17. The SBA now moves for summary judgment, and for the reasons stated herein, the motion will be granted.

## FACTUAL BACKGROUND

Ms. Brown is a GS-13 Procurement Analyst/Procurement Center Representative ("PCR") at the SBA and has worked at the agency since 1980. (Compl. ¶ 7.) In 1992, Ms. Brown filed an Equal Employment Office ("EEO") complaint against her then-supervisor, John Whitmore. (Pl.'s Statement of Material Facts in Dispute ["Pl.'s SMF"] ¶ 2.) That claim was settled in 1995. (*Id.*) In 1998, Ms. Brown filed a second EEO complaint against the SBA, alleging retaliation for her previous claim. (*Id.* ¶ 3.) The parties settled that complaint in 2002. (Def.'s Statement of Undisputed Material Facts ["Def.'s SMF"] ¶ 63; Dep. of Malda J. Brown ["Brown Dep."], Ex. 1 (settlement agreement).) As part of the 2002 settlement, Ms. Brown received a promotion to the

GS-13 grade as a GS-1102-13 Procurement Analyst and began working out of the Department of Health and Human Services ("DHHS").  (Brown Dep., Ex. 1 ¶ 2(b).)  Mr. Whitmore retired from the SBA in 2004.  (Decl. of Calvin Jenkins ["Jenkins Decl."] ¶ 5.)

The duties of a GS-1102-13 Procurement Analyst include "represent[ing] the [SBA] at the installations to which [the analyst is] assigned on any acquisition policy or procedure which affect SBA's mission to assist small business concerns."  (Brown Dep., Ex. 9 at 1 (PCR job description).)  A PCR is charged with "effectively represent[ing] small business concerns with procurement officials" and "counsel[ing] representatives of small business concerns and advis[ing] them how and where to sell their products to the Government."  (*Id.* at 2.) In 2005 and 2006, Ms. Brown worked as a PCR in Rockville, Maryland, at the DHHS offices there.  (Pl.'s SMF ¶ 16.)  Then, as now, Ms. Brown worked in the SBA's Office of Government Contracts, and the chain of command in the office went from plaintiff to Rhonda Anderson, David Loines, Nancyellen Gentile, Arthur Collins, and Karen Hontz, the director of the Office of Government Contracts.  (Def.'s SMF ¶ 4; Dep. of Nancyellen Gentile ["Gentile Dep."], Ex. 1 (organizational chart).)  Between December 2005 and August 2006, Calvin Jenkins was the Deputy Associate Deputy Administrator for Government Contracting and Business Development.  (Jenkins Decl. ¶ 2.)  As such, he supervised both the SBA's "HUBZone" Office—which encourages economic development in historically underutilized business zones— and the SBA Office of Government Contracts.  (*Id.*)  Michael McHale was the head of the HUBZone Office and reported to Mr. Jenkins, as did Ms. Hontz.  (*Id.* ¶ 3.)

On November 8, 2005, the SBA HUBZone program received a HUBZone bid protest concerning a U.S. Department of Homeland Security ("DHS") contract awarded to Shirlington Limousine and Transportation, Inc. ("SLT").  (Pl.'s SMF ¶ 18.)  The protest came from another

HUBZone entity and challenged SLT's eligibility as a HUBZone concern.  (Dep. of Lara Hudson ["Hudson Dep."] at 70.)  The SBA was responsible for processing and making a determination as to SLT's eligibility.  (*Id.*)  In December 2005, Ms. Brown was contacted by the owner of SLT, Christopher Baker, who sought assistance in understanding bid protest procedures.  (Def.'s SMF ¶ 10; Pl.'s SMF ¶ 20; Brown Dep., Ex. 5 at 1 (Brown interview memorandum).)  Ms. Brown had not met Mr. Baker prior to his contact with her in December 2005, but she had heard of him. (Brown Dep., Ex. 5 at 1; Pl.'s SMF ¶ 21.)  During the call, Mr. Baker told plaintiff that Lara Hudson was the SBA attorney working on the SLT HUBZone protest and that he had a package he needed to deliver to her.  (Brown Dep. at 67-68.)  Ms. Brown told Mr. Baker that once he was at the SBA office building, he could call Ms. Hudson's secretary, Bejo Green, to come retrieve the package.  (*Id.* at 68.)

On December 8, 2005, Ms. Brown was in the Washington, D.C. office of the SBA and asked for Ms. Hudson, whereupon Ms. Hudson introduced herself to Ms. Brown.  (Hudson Dep., Ex. 3 (May 15, 2006 email); Pl.'s SMF ¶ 23.)  On December 12, Mr. Baker appeared unannounced and unescorted at Ms. Hudson's office to deliver documents to Ms. Hudson that she had requested from his attorney.  (Hudson Dep., Ex. 4 (Dec. 23, 2005 memorandum to file).) Ms. Hudson and Mr. Baker had a conversation, during which Ms. Hudson mentioned her daughter.  (*Id.*, Ex. 1 at 2 (Hudson interview memorandum).)  Mr. Baker told Ms. Hudson that he was upset about the protest and that "he could throw bricks at the protesting company."  (*Id.* at 1) Ms. Hudson accepted the documents from Mr. Baker and asked him to leave.  (*Id.*; Hudson Dep. at 28.)  Afterwards, Ms. Hudson telephoned Mr. Baker's attorney and advised him that she could not speak to Mr. Baker while the protest was under review and while he was represented by counsel.  (*Id.*, Ex. 1 at 1.)

A week later, on December 19, Ms. Brown placed a telephone call to Ms. Green, Ms. Hudson's secretary, and told her that Mr. Baker would be coming by to drop off a package. (Brown Dep. at 61.)  Ms. Green emailed Ms. Hudson to tell her of Ms. Brown's call and that someone "is suppose[] to be coming over to see" Ms. Hudson.  (Hudson Dep., Ex. 2 at 2 (Dec. 20, 2005 email chain).)  Mr. Baker appeared at Ms. Hudson's office several hours later, unannounced and unescorted.  (*Id.*)  According to Ms. Hudson, the visit made her "uncomfortable."  (Hudson Dep. at 28.)  She thanked him for the information he delivered and told him that she could not speak with him as the protest was an ongoing matter.  (*Id.*, Ex. 4.)  After Mr. Baker's second visit, Ms. Hudson emailed Ms. Green and stated that she believed the call Ms. Green received from Ms. Brown earlier that day regarding the individual who was coming by to deliver a package and Mr. Baker's visit were "related" and that Ms. Brown and Mr. Baker were "acquaintance[s]."  (*Id.*, Ex. 2 at 2.)  Ms. Green then spoke with the Visitors' Center and was told that Mr. Baker had been escorted up to Ms. Hudson's floor but that it was not known who escorted him.  (*Id.* at 1-2.)  Ms. Hudson subsequently checked with the Visitor Desk and was told that Mr. Baker had not signed in.  (*Id.* at 1.)  At that point, Ms. Hudson emailed John Klein, her supervisor, and explained that she was "concerned about the lack of security in the building and the free movement that Chris Baker . . . seems to have getting in the building and up to [her] office."  (*Id.*)  Ms. Hudson then asked security to "investigate how Mr. Baker had gotten to [her] office without an escort and without a badge."  (Hudson Dep. at 37.)  Ms. Hudson subsequently reviewed videotapes of the public entrance to the SBA Headquarters from the days when Mr. Baker arrived at her office, but she did not identify Mr. Baker on the tapes.  (*Id.* at 39.)  Despite her inconclusive investigation, Ms. Hudson did not consider the "matter over" and "still wanted an answer as to how it was that Mr. Baker had accessed the building."  (*Id.* at 66.)

Five months later, in May 2006, Ms. Hudson became aware of media reports concerning Mr. Baker and his involvement with the congressional investigation of former Congressman Randall "Duke" Cunningham.  (*Id.* at 14.)  The coverage included reports of Mr. Baker's criminal history.  (*Id.* at 23.)  Subsequently, Ms. Hudson requested a meeting with Agent Lee K. Bacon of the SBA Office of Inspector General ("OIG") Investigations Division to discuss events that had occurred while she was working on the SLT HUBZone protest, including her concern that Mr. Baker knew personal information about her from his visits.  (*Id.*; at 88-89; Ex. 1.)  She also told Agent Bacon that she suspected that Ms. Brown was involved in allowing Mr. Baker into the SBA building.  (*Id.* at 89; Ex. 1 at 2.)

On or about March 30, 2006, the OIG received a referral from the DHS regarding SLT and opened an investigation of the company.  (Decl. of Lee K. Bacon ["Bacon Decl."] ¶ 3.)  In May 2006, SLT was the subject of a HUBZone program examination, which is distinct from the protest that was filed in November 2005.  (Def.'s SMF ¶ 35; Dep. of David J. Caulfield ["Caulfield Dep."] at 10-11.)   On May 2, Ms. Brown telephoned David Caulfield, a senior program analyst with the HUBZone program whose duties included serving as the operational manager for program examinations.  (Hudson Dep., Ex. 5 at 2 (May 11, 2006 email chain); Caulfield Dep. at 5.)  Ms. Brown asked Mr. Caulfield what had prompted the HUBZone program examination of SLT and told him that she considered SLT "to be one of her clients and, at [SLT's] request, was making certain they weren't being asked the same questions contained in the recent HUBZone protest."  (Hudson Dep., Ex. 5 at 2.)  Mr. Caulfield answered Ms. Brown's questions regarding the program examination and told her that communications regarding the examination of SLT should be "directed to the personnel in the district office conducting the exam," an employee named Theo Holloman.  (*Id.*)

Immediately following the call with Ms. Brown, Mr. Caulfield consulted with former HUBZone Deputy Administrator Mr. Collins, who was then the deputy for government contracting in the Office of Government Contracting.  (Caulfield Dep., Ex. 1 (Caulfield interview memorandum); Dep. of Michael McHale ["McHale Dep."] at 57.)  Mr. Caulfield found Ms. Brown's call to be "unusual" because he did not usually receive calls "specific to a particular circumstance involving a named company."  (Caulfield Dep. at 35.)  Mr. Caulfield and Mr. Collins felt that Ms. Brown's contact with Mr. Caulfield was abnormal enough to warrant notification of Mr. McHale, the head of the HUBZone office.  (*Id.* at 57; Ex. 1.)  Mr. Caulfield sent Mr. McHale an email summarizing his conversation with Ms. Brown and stating that "[t]o [his] mind, the call from Malda was unusual in that [he] d[id]n't often get calls from PCRs on HUBZone program examinations."  (Hudson Dep., Ex. 5 at 2.)   After sending the email to Mr. McHale, Mr. Caulfield received a second call from Ms. Brown, again asking for information concerning SLT.  (Caulfield Dep., Ex. 1.)

Mr. McHale also found that Ms. Brown's call to Mr. Caulfield was "unusual." (McHale Dep. at 18.)  When he replied to Mr. Caulfield's email on May 3, he copied Mr. Collins. (Hudson Dep., Ex. 5 at 1.)  Mr. McHale stated that he had received a call from Mr. Holloman regarding Ms. Brown's interest in the SLT program examination.  (*Id.*)  Subsequently, Mr. McHale learned that two other SBA employees, Brenda Washington and Diane Jones, had been contacted by Ms. Brown during the SLT bid protest.  (*Id.*)  On May 11, Mr. McHale emailed Mr. Collins to inform him of Ms. Brown's prior contact with Ms. Washington and Ms. Jones.  (*Id.*) Mr. Collins, who was Ms. Brown's supervisor, then forwarded the emails he had received from Mr. McHale to Ms. Hontz, the director of the Office of Government Contracts.  (*Id.*)  In his forwarded email to Ms. Hontz, Mr. Collins stated that he was "not sure that this level of

advocacy is good.  Without jumping to conclusions, this has the potential of being embarrassing."  (*Id.*)  Ms. Hontz forwarded the email chain to her immediate supervisor, Mr. Jenkins, and Ms. Gentile, Ms. Brown's third-level supervisor.  (*Id.*)

On May 12, after receiving the email chain forwarded by Ms. Hontz, Mr. Jenkins asked Mr. McHale to prepare a memorandum for Ms. Hontz regarding plaintiff's interactions with the SBA staff on behalf of SLT.  (McHale Dep., Ex. 7; Def.'s SMF ¶ 45.)  Mr. McHale contacted staff in the Office of Government Contracting and his own staff in the HUBZone office and asked for information regarding Ms. Brown and SLT.  (McHale Dep. at 50-51.)   Mr. McHale sent this information to Ms. Hontz, who referred Ms. Brown to the OIG for investigation.  (*Id.* at 51; Dep. of Karen Hontz ["Hontz Dep.] at 54-55.)  The OIG opened an investigation into Ms. Brown based on her "suspected involvement with [Mr.] Baker's unauthorized access to SBA headquarters and Ms. Brown's inquiries regarding [the] HUBZone program examination involving [SLT]" and consolidated it with the already-open investigation of SLT.  (Bacon Decl. ¶ 3.)  On May 24, Agent Bacon interviewed Ms. Brown regarding her activities "on behalf of [Mr.] Baker."  (Brown Dep., Ex. 5 at 1.)  The interview memorandum summarizing Agent Bacon's interview of Ms. Brown states that Ms. Brown said she had contacted Ms. Washington and Ms. Jones regarding the SLT bid protest and Mr. Caulfield and Mr. Holloman regarding the SLT HUBZone program examination.  (*Id.* at 1-2.)  It also notes that Ms. Brown stated that she had "call[ed] and ask[ed] someone to allow Baker into the [SBA] building."  (*Id.* at 2.)

On June 19, Agent Bacon sent the interview memorandum to Mr. Jenkins, Mr. McHale, and Mr. Collins.  (Dep. of Calvin Jenkins ["Jenkins Dep."], Ex. 4 (June 23, 2006 email chain).)  Agent Bacon explained that the interview had been conducted as a result of the information provided to the OIG by Ms. Hudson and stated that if Mr. Jenkins or Mr. McHale had any

"questions or concerns regarding the information [Ms. Brown] provided," they should let him know. (*Id.*) Several days later, on June 23, Mr. Jenkins responded to Agent Bacon's email by stating that the interview memorandum was "an incomplete review of the facts in this matter" because "[i]nterviews were not conducted with staff in the Office of HUBZone or [the] Washington [SBA office]," which might have resulted in statements contradicting Ms. Brown's. (*Id.*) Mr. Jenkins then noted that Congress was "looking into undue interference in the award of contracts to [SLT] and the HUBZone certification and protest process." (*Id.*) He then stated that he felt it "necessary that the OIG review include statements from Lara Hudson, HUBZone and Washington District Office staff." (*Id.*)

Subsequent to Mr. Jenkins' email, Peter McClintock, the SBA's Deputy General Inspector, held a meeting with Mr. Jenkins and Agent Bacon to discuss Ms. Brown and Mr. Jenkins' "concerns of the visibility of the case" and his desire to make sure that the SBA "left no stone unturned." (*Id.* at 53-54.) Following this meeting, on July 3, 2006, the OIG opened an investigation of Ms. Brown. (*Id.*, Ex. 5 (OIG report).) Agent Bacon interviewed eight additional SBA staff members and compiled a Report of Investigation ("ROI"), dated July 25, 2006. (*Id.* at 1, 4.) The ROI states that the referral to the OIG "did not allege a violation of the U.S. Criminal Code" and the "matter was not referred to the U.S. Attorney's Office due to lack of evidence of any criminal violation." (*Id.* at 1-2.)

In August 2006, following the OIG investigation, Ms. Hontz asked Mr. Collins to "contact [Ms.] Gentile . . . and to work with the others in the chain of command and the SBA's Office of Human Capital Management" to determine whether a reprimand was warranted. (Hontz Dep., Ex. 1 ¶ 10 (Hontz Aff.); Def.'s SMF ¶ 58.) Mr. Jenkins also contacted Ms. Gentile and instructed her to contact Ms. Brown's supervisor, Ms. Anderson, and have Ms. Anderson tell

Ms. Brown that in the future, she was not "to let someone gain access to [SBA's] secure space unless she's the person receiving them." (Jenkins Dep. at 20-21.) On August 24, Ms. Gentile emailed Ms. Anderson and directed her to give Ms. Brown the following verbal instruction:

> [S]he should not have contacted SBA Headquarters staff to request assistance in providing Mr. Baker, Shirlington Limousine, access to the SBA Headquarters building if she had not planned to accompany him on a pre-scheduled appointment/meeting. Please caution [Ms. Brown] that, in the future, she should not make such a request, unless she plans to accompany the client on the meeting and/or the SBA official has been properly notified and has accepted the request to meet with the individual.

(Gentile Dep., Ex. 2 (Aug. 24, 2006 email).)

Ms. Brown initiated contact with an EEO Counselor on July 6, 2006. (Compl. ¶ 5.) She was issued a notice of Right to File a Formal Complaint on September 1, 2006. (*Id.*) On September 15, Ms. Brown filed a formal complaint of employment discrimination against the SBA on the basis of race and retaliation. (*Id.*) The SBA initiated an investigation and issued the Report of Investigation on November 29, 2007. (*Id.*) On March 31, 2008, the SBA issued its Final Agency Decision that Ms. Brown had failed to show by a preponderance of the evidence that the SBA management had discriminated against her on the basis of race and retaliation. (*Id.*) Ms. Brown filed the instant complaint on June 26, 2008, within 90 days of her receipt of the Final Agency Decision. (*Id.*) She alleges that "[a]s a direct and proximate result of filing prior EEO complaints of discrimination and as a direct and proximate result of having had to settle the previous EEO complaints with plaintiff, Defendant employees made false and defamatory statements about Plaintiff and improperly subjected her to investigation by the Agency including initiation of a [*sic*] IG investigation based on false information solely to harass and retaliate against Plaintiff." (*Id.* ¶ 32.)

## ANALYSIS

### I.   STANDARD OF REVIEW

A motion for summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). There is a "genuine issue" of material fact if a "reasonable jury could return a verdict for the nonmoving party." *Galvin v. Eli Lilly and Co.*, 488 F.3d 1026, 1031 (D.C. Cir. 2007) (quoting *Anderson*, 477 U.S. at 248). A moving party is thus entitled to summary judgment against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Waterhouse v. District of Columbia*, 298 F.3d 989, 992 (D.C. Cir. 2002) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

When considering a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor." *Anderson*, 477 U.S. at 255; *see also Wash. Post Co. v. U.S. Dep't of Health and Human Servs.*, 865 F.2d 320, 325 (D.C. Cir. 1989). However, the non-moving party "may not rely merely on allegations or denials in its own pleading." Fed. R. Civ. P. 56(e)(2). "While summary judgment must be approached with special caution in discrimination cases, a plaintiff is not relieved of her obligation to support her allegations by affidavits or other competent evidence showing that there is a genuine issue for trial." *Calhoun v. Johnson*, No. 95-2397, 1998 WL 164780, at *3 (D.D.C. Mar. 31, 1998), *aff'd* No. 99-5126, 1999 WL 825425 (D.C. Cir. Sept. 27, 1999) (internal citation omitted).

## II.       LEGAL STANDARD FOR RETALIATION CLAIMS UNDER TITLE VII

It is unlawful under Title VII for an employer to discriminate against an employee

because she "has opposed any practice made an unlawful employment practice" by Title VII or

because she "has made a charge, testified, assisted, or participated in any manner in an

investigation, proceeding, or hearing" under Title VII.  42 U.S.C. § 2000e-3(a).  "The anti-

retaliation provision protects an individual not from all retaliation, but from retaliation that

produces an injury or harm."  *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 67

(2006).  To prove a retaliation claim under Title VII, a plaintiff "generally must establish that he

or she suffered (i) a materially adverse action (ii) because he or she had brought or threatened to

bring a discrimination claim."  *Baloch v. Kempthorne*, 550 F.3d 1191, 1198 (D.C. Cir. 2008); *see

also* 42 U.S.C. § 2000e-3(a).  A "materially adverse" action is one that would have "'dissuaded a

reasonable worker from making or supporting a charge of discrimination.'"  *Burlington*, 548

U.S. at 68 (quoting *Rochon v. Gonzales*, 438 F.3d 1211, 1219 (D.C. Cir. 2006)).  "The issue of

whether a particular employment action was 'materially adverse' is fact-intensive and 'depends

upon the circumstances of the particular case, and should be judged from the perspective of a

reasonable person in the plaintiff's position, considering all the circumstances.'"  *Howard v.

Gutierrez*, 237 F.R.D. 310, 313 (D.D.C. 2006) (quoting *Burlington*, 548 U.S. at 71) (internal

quotations omitted).

"[R]etaliation claims based on circumstantial evidence—like [Brown's]—trigger the

familiar burden shifting framework of *McDonnell Douglas* [*Corp. v. Green*, 411 U.S. 792

(1973)]."  *Jones v. Bernanke*, 557 F.3d 670, 677 (D.C. Cir. 2009).  However, where a defendant

"has asserted a legitimate, non-discriminatory reason for [its action], the district court need not—

*and should not*—decide whether the plaintiff actually made out a prima facie case under

*McDonnell Douglas*." *Brady v. Office of the Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008). Rather, at that point, "the burden-shifting framework disappears, and a court reviewing summary judgment looks to whether a reasonable jury could infer . . . retaliation from all the evidence."[1] *Jones*, 557 F.3d at 677 (quoting *Carter v. George Wash. Univ.*, 387 F.3d 872, 878 (D.C. Cir. 2004)). "At that stage, the only question is whether the employee's evidence creates a material dispute on the issue of retaliation 'either directly by [showing] that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence.'" *Id.* at 678 (quoting *U.S. Postal Serv. Bd. of Governors v. Aikens*, 460 U.S. 711, 716 (1983)). "The court can resolve that question in favor of the employer based either upon the employee's failure to rebut [the employer's] explanation or upon the employee's failure to prove an element of her case," such as the employer's commission of a materially adverse act. *Taylor v. Solis*, 571 F.3d 1313, 1320 n.4 (D.C. Cir. 2009). "Evidence" includes "not only the prima facie case but also the evidence the plaintiff offers to 'attack the employer's proffered explanation for its action' and other evidence of retaliation." *Jones*, 557 F.3d at 677 (quoting *Carter*, 387 F.3d at 878).

A plaintiff has the burden of persuasion to show that a defendant's proffered non-discriminatory reason for the challenged action is a pretext, *Morgan v. Fed. Home Loan Mortgage Corp.*, 328 F.3d 647, 654 (D.C. Cir. 2003), and she must "prove by a preponderance of the evidence that the legitimate reasons offered by the defendant were not its true reasons, but a pretext." *Woodruff v. Peters*, 482 F.3d 521, 529 (D.C. Cir. 2007) (quoting *Reeves v. Sanderson*

---

[1] Contrary to plaintiff's argument (*see* Pl.'s Mem. of P. & A.'s in Opp'n to Def.'s Mot. for Summ. J. ["Pl.'s Opp'n"] at 3-4), if a defendant also disputes the existence of a "materially adverse" action, in addition to providing non-discriminatory reasons for that action, courts may choose to address that issue before proceeding to the question of whether the plaintiff has produced enough evidence to show that the actions were retaliatory. *See Baloch*, 550 F.3d at 1198-1200 (engaging in adversity inquiry first).

*Plumbing Prods., Inc.*, 530 U.S. 133, 143 (2000)).  A plaintiff can carry her burden by showing

that a non-discriminatory reason offered by a defendant is false, *Montgomery v. Chao*, 546 F.3d

703, 707 (D.C. Cir. 2008), or otherwise "presenting enough evidence to allow a reasonable trier

of fact to conclude that the proffered explanation is unworthy of credence."  *Desmond v.*

*Mukasey*, 530 F.3d 944, 962 (D.C. Cir. 2008) (internal quotation marks omitted).  A plaintiff

may also "attempt[] to produce evidence suggesting that the employer treated other employees . .

. more favorably in the same factual circumstances" than the employer treated the plaintiff.

*Brady*, 520 F.3d at 495.  Where "the employer's stated belief about the underlying facts is

reasonable in light of the evidence, however, there ordinarily is no basis for permitting a jury to

conclude that the employer is lying about the underlying facts," and summary judgment is

appropriate.  *Id.*; *see also Paquin v. Fed. Nat'l Mortgage Ass'n*, 119 F.3d 23, 27-28 (D.C. Cir.

1997) ("[I]f [plaintiff] is unable to adduce evidence that could allow a reasonable trier of fact to

conclude that [defendant's] proffered reason was a pretext for [retaliation], summary judgment

must be entered against [plaintiff].")

## III.    THE OIG INVESTIGATION AND INSTRUCTION

Ms. Brown alleges that she was improperly subjected to the OIG investigation as a result

of retaliation by the SBA for her prior EEO claims.[2]  (Compl. ¶ 32.)  In response, the SBA

explains that it initiated the OIG investigation of Ms. Brown pursuant to an agency regulation

stating that "[e]very employee shall immediately report to the SBA Inspector General any acts of

---

[2] Ms. Brown alleges in her complaint that the SBA retaliated against her when SBA employees
1) made false and defamatory statements about her; and 2) improperly subjected her to an OIG
investigation.  (Compl. ¶ 32.)  However, Ms. Brown does not summarize or identify the alleged
defamatory and false statements, and her opposition brief discusses only statements made in the
context of the OIG investigation.  (*See* Pl.'s Opp'n at 6, 8.)  As such, the Court considers the
events comprising the OIG investigation, including any allegedly false and defamatory
statements, collectively.

malfeasance or misfeasance or other irregularities, either actual or suspected, arising in connection with the performance by SBA of any of its official functions."[3] 13 C.F.R. § 105.205. The agency maintains that Ms. Brown's OIG investigation resulted from the "independent observations of two of Plaintiff's colleagues, Ms. Hudson and Mr. Caulfield," both of whom "considered Plaintiff's conduct relating to [SLT] to be 'unusual' enough to cause them to report it to their immediate supervisors."  (Def.'s Mem. at 28-29.)  Specifically, defendant argues that Ms. Hudson "reasonably believed that Plaintiff had improperly permitted Mr. Baker to enter the SBA Headquarters building" and that Mr. Caulfield "believed that Plaintiff's inquiries on behalf of [SLT] were 'unusual' and necessitated alerting his supervisor."  (*Id.* at 33.)  Defendant alleges that these reports made their way to Mr. Jenkins and Ms. Hontz, who felt that Ms. Brown's acts warranted a referral to the OIG, in part because of the contracting fraud investigation of SLT. (*Id.* at 32-33.)

Because the SBA has articulated a non-discriminatory reason for the OIG investigation, the Court must determine whether Ms. Brown has produced sufficient evidence for a reasonable jury to infer retaliation from the SBA's actions.  *Brady*, 520 F.3d at 494.  The Court finds that Ms. Brown has not satisfied this standard.  Specifically, the Court finds that plaintiff has not presented evidence sufficient to allow a jury to conclude that the OIG investigation at issue was materially adverse or that defendant's proffered explanation for the investigation is pretextual.

---

[3] Ms. Brown maintains that the SBA's asserted explanation for its investigation is that there was "'substantial evidence' that [Ms. Brown] committed fraud, waste and abuse by communicating with the HUBZone office and by allegedly granting Mr. Baker access to SBA Headquarters." (Pl.'s Opp'n at 1.)  However, defendant clearly states that its decision to investigate Ms. Brown stemmed from independent reports of her "unusual" behavior, and that the reports were made pursuant to an agency regulation directing employees to report any "irregularities, either actual or suspected."  (Def.'s Mem. at 28, 32.)  The Court proceeds by reviewing the evidence in light of "the [SBA]'s asserted non-discriminatory reason" for the investigation, not Ms. Brown's inaccurate characterization of the reasons for the investigation.  *Brady*, 520 F.3d at 494.

### A.  Material Adversity

The Court finds that the OIG investigation of Ms. Brown and the subsequent verbal instruction she received are not materially adverse because no reasonable jury could conclude that these actions would have dissuaded a reasonable worker from complaining of discrimination.  Plaintiff alleges that "[a]ny person subject to an IG investigation is cast under the shadow of the accusation that the employee has committed fraud, waste, and abuse which may result in a criminal Federal prosecution."  (Pl.'s Opp'n at 19.)  Ms. Brown states that her "co-employees were reluctant to work with her and stayed away from her for fear of management associating them with [her]."  (*Id.*)  She also states that the "reprimand" she received caused her to "suffer[] emotional distress, [go] under doctor's care, [be] placed on medication and . . . take leave for three months."  (*Id.* at 19-20.)  She asserts that the "emotional distress and loss of 152 hours of sick leave is materially adverse harm."  (*Id.* at 20.)

Despite plaintiff's allegations, there is no evidence that Ms. Brown's reputation suffered as a result of the OIG investigation.  Although Ms. Brown may have believed that her co-employees were "reluctant" to work with her or avoided her based on the investigation, she offered nothing to substantiate such a claim.  "Purely subjective perceptions of stigma or loss of reputation are insufficient to make an employer's action 'materially adverse.'"  *Rattigan v. Holder*, 604 F. Supp. 2d 33, 51 (D.D.C. 2009) ("*Rattigan III*").  Ms. Brown correctly states that "clear, actual damage to one's career is not required" to establish a materially adverse act.  (Pl.'s Opp'n at 20.)  Rather, the "touchstone for 'material adversity' is deterrence."  *Rattigan III*, 604 F. Supp. 2d at 52.  However, Ms. Brown must demonstrate that the OIG investigation "would have been material to [*i.e.*, would have deterred] a *reasonable* employee."  *Rochon*, 438 F.3d at 1219 (emphasis added); *see also Burlington,* 548 U.S. at 71 (relying on objective indicators of

"prestige" when determining whether plaintiff's reassignment was materially adverse); *Rattigan III*, 604 F. Supp. 2d at 54 ("[P]laintiff's purely *subjective* perception that the . . . security investigation jeopardized his 'career goals' does not make defendant's actions materially adverse. . . .  Rather, plaintiff must provide evidence that the security investigation posed an *objective* harm to his reputation or prospects.").

Nor is there any evidence to support Ms. Brown's claims that OIG investigations "cast . . . a shadow" on SBA employees.  (Pl.'s Opp'n at 19.)  Rather, there is evidence that OIG investigations are relatively commonplace and that the "vast majority of such matters do not result in the termination or discipline of the SBA employee being investigated." [4]  (Bacon Decl. ¶ 4.)  Ms. Brown's claim that her reputation was harmed because the investigation might have resulted in "criminal Federal prosecution" is undermined by the fact that Ms. Brown's referral to the OIG "did not allege a violation of the U.S. Criminal Code."  (Jenkins Dep., Ex. 5 at 1.)  Moreover, there is evidence that "investigations by the [OIG] are confidential and the information gathered therein is furnished solely on an official need-to-know basis."  (Bacon Decl. ¶ 4.)  This suggests that few, if any, of Ms. Brown's non-management colleagues (*i.e.*, those individuals who allegedly avoided plaintiff so that management would not associate them with her) were even aware of the investigation.[5]  Ms. Brown's speculation that there "inevitable

---

[4] In contrast, in *Rattigan III*, on which Ms. Brown relies in her opposition, there was third-party evidence that the investigation to which plaintiff was subjected was "a very serious allegation with potentially devastating effects" on plaintiff's career.  *Rattigan III*, 604 F. Supp. 2d at 54.  In that case, the record suggested that the "investigation of [the plaintiff] as a security risk [wa]s a very serious matter that could derail his career, possibly even if the investigation was unsubstantiated."  (*Id.*)  Here, there is no evidence that the OIG investigation posed a similar threat, or any threat at all, to Ms. Brown.

[5] Ms. Brown contends that an August 24, 2009 letter from defendant's counsel suggests that the "IG report is readily accessible to SBA staff and, accordingly, the repeated allegations contained in the various statements continue to be available to co-workers and management."  (Pl.'s Opp'n

[*sic*] are others" who knew of the investigation because it involved a "public scandal" is

unsubstantiated.  (Pl.'s Opp'n at 21-22.)  Furthermore, there is no evidence that the investigation,

which lasted just over two months and found that there was a "lack of evidence of any criminal

violation," had any effect on Ms. Brown's conditions or terms of employment.  *See Velikonja v.*

*Gonzales*, 501 F. Supp. 2d 65, 73 (D.D.C. 2007) (finding that investigation referral that "did not

result in any additional disciplinary action, and thus . . . ultimately had no practical consequence

for [plaintiff's] employment" was not materially adverse).

  Similarly, the verbal "reprimand" received by Ms. Brown is not materially adverse.

Again, plaintiff must adduce evidence that the instruction given to her would have deterred a

"reasonable" employee from pursuing a discrimination claim.  *Burlington*, 548 U.S. at 68.  Here,

the "reprimand" Ms. Brown received was verbal, informal, and contained only instructions as to

SBA procedures regarding visitors.  (Gentile Dep., Ex. 2.)  There is no evidence that the

instruction was placed in her file, carried any consequences, or had any effect on her

employment.  Indeed, the supervisor who gave Ms. Brown the instruction, Ms. Anderson, states

that she was "not asked to reprimand" Ms. Brown and did not consider what she told plaintiff to

be "a reprimand or a counseling, nor was it any form of disciplinary action."  (EEO Affidavit of

Rhonda Anderson ("Anderson Aff.") ¶ 4.)  Ms. Brown argues that Ms. Anderson's state of mind

---

at 21.)  In fact, the letter in question concerns a report from an investigation conducted by Agent
Bacon in the course of a separate OIG investigation of Ms. Brown that took place in 2007.  (Pl.'s
Opp'n, Ex. I at 5 (Aug. 24, 2009 letter)) ("The document at issue is a Memorandum of Interview
by Peter Benoit conducted by Agent Lee Bacon of the SBA's [OIG] in the course of an unrelated
investigation in 2007.")  The letter makes no mention of the IG report at issue in this case.
Furthermore, the letter maintains only that defense counsel's use of the 2007 report during the
instant litigation did not violate the Privacy Act.  (*Id.* at 1-4.)  Nowhere does the letter support
Ms. Brown's contention that IG reports are available to Ms. Brown's co-workers and
management.  Indeed, there is contrary evidence suggesting that such reports are not "readily
accessible" to anyone, are maintained as confidential, and are furnished "solely on an official
need-to-know basis."  (Bacon Decl. ¶ 4.)

is irrelevant (Pl.'s SMF ¶ B(61)), but Ms. Anderson's benign understanding of the instruction she gave suggests that a "reasonable" employee would not have been deterred by it.  Moreover, even taking Ms. Brown's assertions as to "emotional distress" as true, the effects of the instruction on Ms. Brown do not constitute "objective" evidence that a "reasonable" employee would have been affected in the same way.  Given the relatively mild nature of the instruction and the absence of any consequences to plaintiff as a result of it, there is nothing to suggest that it would have dissuaded a reasonable employee from complaining of discrimination.  *See Baloch*, 550 F.3d at 1199 (where "[a] letter of counseling, letter of reprimand, and unsatisfactory performance review" contained "no abusive language, but rather job-related constructive criticism," letters were not materially adverse); *Cochise v. Salazar*, 601 F. Supp. 2d 196, 201 (D.D.C. 2009) ("Neither letters of counseling that contain job-related constructive criticism . . . nor warnings without attendant effects on employment, such as [defendant's] caution against dishonesty during the administrative investigation, are materially adverse employment actions."); *Halcomb v. Office of Senate Sergeant-at-Arms of U.S. Senate*, 563 F. Supp. 2d 228, 246-47 (D.D.C. 2008) (where plaintiff received counseling memorandum and written warning for refusal to perform tasks, neither "constituted an adverse employment action because they did not [a]ffect the plaintiff's employment").

### B.  Pretext

But even if one were to assume *arguendo* that the investigation of Ms. Brown and the instruction she received constituted materially adverse acts (which they did not), plaintiff has not adduced evidence sufficient for a reasonable jury to conclude that the explanation proffered by the SBA for the investigation and the instruction were a pretext for retaliatory animus.  The OIG investigation of plaintiff occurred nearly four years after the settlement of her earlier EEO claims

against the SBA (Def.'s Mem. at 18), and thus there is a lack of a causal connection between these two events.  *See Clark County Sch. Dist. v. Breeden*, 532 U.S. 268, 273 (2001) (alleged discriminatory action taken 20 months after protected act "suggests, by itself, no causality at all").  Moreover, there is substantial evidence to bolster the SBA's non-discriminatory explanation for its referral of plaintiff to the OIG.  As such, plaintiff cannot meet her burden of persuasion to show that defendant's stated reasons for the investigation are pretextual, and summary judgment is appropriate.  *See Paquin*, 119 F.3d 23, 27-28.

Ms. Brown essentially advances four arguments in support of her claim that the SBA's explanation is pretextual: 1) the SBA knew that plaintiff did not engage in improper conduct prior to initiating the OIG investigation; 2) the SBA's arguments do not establish the truth of its explanation;  3) Mr. Jenkins insisted that the OIG investigation continue after Agent Bacon's interview of Ms. Brown; and 4) Ms. Brown was given a verbal instruction even though the OIG investigation did not result in her referral for criminal prosecution.  (Pl.'s Opp'n at 5, 12, 15, 16.) The Court will address each argument in *seriatim*.

> 1.  *The SBA Knew That Ms. Brown Did Not Engage in Improper Conduct Prior to the OIG Investigation*

Ms. Brown maintains that the SBA knew, prior to the initiation of the OIG investigation, that she had not engaged in any improper conduct and that, as such, their proffered explanations for the investigation are false.  (Pl.'s Opp'n at 5.)  She argues that the SBA employees who reported her behavior, either to supervisors or the OIG, knew or could have known that the investigation was "not justified."  (*Id.* at 5-11.)

a.  Messrs. Caulfield and McHale

Ms. Brown argues that although Mr. Caulfield and Mr. McHale considered her calls to be "unusual," they were unfamiliar with Ms. Brown's duties as a PCR and therefore should not have presumed her contact with Mr. Caulfield to be out of the ordinary.  (*Id.* at 5-6.)  The question before the Court, however, is not whether Mr. Caulfield's and Mr. McHale's classification of Ms. Brown's calls as "unusual" was justified or fair given a nuanced understanding of her job, but rather whether they reasonably believed plaintiff's contact with Mr. Caulfield to be abnormal and reported it pursuant to their understanding of SBA regulations obligating them to inform their supervisors of any "irregularities, either actual or suspected." *Fischbach v. Dist. of Columbia Dep't of Corr.*, 86 F.3d 1180, 1183 (D.C. Cir. 1996) ("Once the employer has articulated a non-discriminatory explanation for its action . . . the issue is not 'the correctness or desirability of the reasons offered . . . but whether the employer honestly believes in the reasons it offers.'") (quoting *McCoy v. WGN Cont'l Broad. Co.*, 957 F.2d 368, 373 (7th Cir. 1992)); *see also Pignato v. Am. Trans Air, Inc.,* 14 F.3d 342, 349 (7th Cir. 1994) ("It is not enough for the plaintiff to show that a reason given for a job action is not just, or fair, or sensible. He must show that the explanation given is a 'phony reason.'").  Here, if Mr. Caulfield and Mr. McHale reported Ms. Brown's conduct because they concluded they were required to do so under the SBA reporting regulation, whether they would have come to a different conclusion had they consulted Ms. Brown's standard operating procedures is immaterial.

In his deposition, Mr. Caulfield stated that he found Ms. Brown's contact to be "unusual"[6] and "out of the ordinary" and that he understood that "any out-of-the-norm

---

[6] Ms. Brown maintains that Mr. Caulfield's characterization of her contact with him was "disparaging."  (Pl.'s Opp'n at 6.)  Again, however, the Court looks not to whether Mr. Caulfield's assessment was fair or even correct, but whether he believed it to be true.  *Fischbach,*

experience should be routed up to supervisory personnel so that a decision can be made as to whether or not [he] executed [his] duties properly." (Caulfield Dep. at 33-34; *see also id.* at 35 ("[W]hat is unusual is that a call would come into my office, specific to a particular circumstance involving a named company. Generally, I'm overseeing the process. I am not executing a specific program examination."). Mr. McHale also testified that he found Ms. Brown's calls as a PCR to Mr. Caulfield in the HUBZone office to be "unusual." (McHale Dep. at 18 ("There's just no relationship between the program examination and the PCRs. . . . I don't know of any linkage between the PCRs [*sic*] responsibility or function and the program examination."). Plaintiff presents no evidence to suggest that these explanations are "phony" or otherwise untrue. Rather, she illogically argues that the failure of Messrs. Caulfield and McHale to familiarize themselves with the job requirements of the PCR position means that their explanation of their decision to report her conduct is untrue. (Pl.'s Opp'n at 6.) Yet, this failure actually militates against the inference of a discriminatory motive on the part of Mr. Caulfield and Mr. McHale because, lacking knowledge as to the official duties of a PCR, they would have no reason to think Ms. Brown was operating within the bounds of her position when she contacted Mr. Caulfield. *See Hamilton v. Paulson*, 542 F. Supp. 2d 37, 46 n.7 (D.D.C. 2008). And there is no evidence (or allegation) that Messrs. Caulfield or McHale were even aware of Ms. Brown's prior EEO complaints against and settlements with the SBA, events that occurred some four years prior to the events at issue. Nor is there any reason to suspect that either of these employees

---

86 F.3d at 1183. Here, there is no evidence to suggest that Mr. Caulfield made his remark in order to vilify or denigrate Ms. Brown. Rather, Mr. Caulfield stated that it was "not [his] experience in interacting with [PCRs] that they would advocate on behalf of a specific company." (Caulfield Dep. at 28.) While he personally did not "think [her calls were] inappropriate," he understood that he was obligated to report any "out-of-the-norm experience." (*Id.* at 33.)

were motivated to retaliate against plaintiff because of her prior protected activity involving John Whitmore, who had left the SBA two years before these events occurred.

b.   Mr. Collins

Ms. Brown contends that Mr. Collins "d[id] not state that [Ms. Brown's] actions [we]re improper, inappropriate, wasteful, fraudulent, or abusive" when he forwarded Mr. McHale's email to Ms. Hontz.  (Pl.'s Opp'n at 6.)  However, Mr. Collins stated in the email that he was not sure that Ms. Brown's "level of advocacy [wa]s good" and that it had the "potential of being embarrassing."  (Hudson Dep., Ex. 5 at 1.)  These statements suggest that Mr. Collins agreed with other SBA employees that Ms. Brown's behavior was, at best, out of the ordinary and, at worst, potentially harmful.  Mr. Caulfield also told Agent Bacon during his interview with the OIG that "[b]oth Collins and [he] felt the contact was unusual enough to warrant the email to McHale."  (Caulfield Dep., Ex. 1 (Caulfield interview memorandum).)  Ms. Brown has adduced no evidence contradicting these statements or suggesting that Mr. Collins knew Ms. Brown's conduct was not improper at the time he reported it to Ms. Hontz.  Moreover, as with Messrs. Caulfield and McHale, there is *no* evidence that Mr. Collins knew Mr. Whitmore or was aware of Ms. Brown's prior EEO activity.

c.   Ms. Hontz

Ms. Brown maintains that Ms. Hontz "admitted that Plaintiff had not committed waste" and that "Plaintiff's call to Caulfield was not something that justified in [*sic*] referring to an IG's investigation."  (Pl.'s Opp'n at 6-7.)  As such, she argues that Ms. Hontz's explanation for referring Ms. Brown to the OIG—that Ms. Brown's actions were "serious enough" that it was necessary to refer the matter— is untrue.  (*Id.*)  However, Ms. Hontz stated in her deposition that while she did not think that waste was an issue, she did suspect "abuse and potential fraud."

(Hontz Dep. at 38.)  Moreover, Ms. Hontz testified that it was the combination of Ms. Brown's

unusual contact with Mr. Caulfield and her possible involvement with Mr. Baker's appearances

in Ms. Hudson's office that led her to refer Ms. Brown.  (*Id.* at 57, Ex. 1 ¶ 9.)  There is no

evidence suggesting that Ms. Hontz did not suspect abuse or fraud or that she did not reasonably

rely on the reports from her subordinates that Ms. Brown's conduct was unusual.  Ms. Brown's

speculation that "the IG investigation was initiated by Mr. Jenkins and Ms. Hontz in retaliation

for Ms. Brown's discrimination complaints about Mr. Whitmore" is insufficient to counter Ms.

Hontz's explanation regarding her decision to refer Ms. Brown. [7]  *See*, *e.g.*, *Asghar v. Paulson*,

580 F. Supp. 2d 30, 37 n.15 ("Plaintiff's unsupported, personal speculation about the motivations

of [defendant] is, without more, simply not enough to show pretext.").  As such, there is no basis

for a jury to conclude that Ms. Hontz, or the other employees who reported plaintiff's contact

with Mr. Caulfield or Mr. Baker, were lying.  *See Brady*, 520 F.3d at 495.

Ms. Brown also alleges that the "public nature of the matter involving Shirlington

Limousine . . . imposed on SBA [the need] to take extra steps to ensure there was a substantial

basis to initiate an IG investigation that would link Ms. Brown to the scandal" and that Ms.

Hontz and Mr. Jenkins "failed to ask the necessary questions to determine if there was any

credible evidence of fraud, waste, and abuse by Ms. Brown before taking the dramatic step of

initiating the IG investigation."  (Pl.'s Opp'n at 10.)  Yet, plaintiff points to no evidence that Ms.

---

[7] Ms. Brown presents no evidence as to why Ms. Hontz would want to retaliate against her.  The complaint alleges that "Ms. Hontz is a personal friend of John Whitmore" and that she "was aware of that [sic] Plaintiff had prior EEO complaints involving Mr. Whitmore."  (Compl. ¶ 17.) Yet, Ms. Hontz testified that she last met with Mr. Whitmore "[s]ix years ago" and that Mr. Whitmore told her nothing about Ms. Brown.  (Hontz Dep. at 56.)  There is no evidence that Ms. Hontz was influenced by Mr. Whitmore and was thus "determined to punish Plaintiff." (Pl.'s Opp'n at 10).  The mere possibility that Ms. Hontz's action was retaliatory is not sufficient to show that her explanation is pretextual.  *See Vickers v. Powell*, 493 F.3d 186, 196 (D.C. Cir. 2007).  ("The mere possibility of an allegation of [retaliation] without supporting evidence does not create a presumption of illegality against [defendant's action].").

Hontz and Mr. Jenkins had a duty to investigate Ms. Brown themselves before reporting her to the OIG.  The SBA reporting regulation imposes no such obligation, and Ms. Hontz testified that it was *because* of the high-profile nature of the case and the fact of the federal investigation of SLT that she felt compelled to take the matter to the OIG rather than consult with Ms. Brown directly.  (Hontz Dep. at 53-54.)  There is no evidence to suggest that Ms. Hontz believed she had the option of speaking with Ms. Brown rather than referring her for investigation.  There is, therefore, insufficient evidence for a reasonable jury to conclude that Ms. Hontz believed Ms. Brown's conduct to be normal and acceptable but reported her anyway.

d.  Mr. Jenkins

Plaintiff alleges that Mr. Jenkins "never looked at the responsibilities and duties in relation to Ms. Brown and [SLT]" and that had he and others done so, he would have learned that Ms. Brown's contact with Mr. Caulfield "*was not* improper or inappropriate."  (Pl.'s Opp'n at 11.)  Again, however, the question before the Court is whether Mr. Jenkins actually believed that Ms. Brown's behavior was unusual and that reporting it was required, not whether Ms. Brown in fact acted properly.  *Fischbach*, 86 F.3d at 1183.  The fact that Mr. Jenkins was unaware of procedures that allegedly justified Ms. Brown's conduct supports the legitimacy of his belief that Ms. Brown was behaving unusually and/or without authorization.  *See Hamilton*, 542 F. Supp. 2d at 46 n.7.  Moreover, there is substantial evidence that far from ignoring information that would have justified Ms. Brown's conduct, Mr. Jenkins attempted to gather as much information as possible about plaintiff's acts through Mr. McHale and other subordinates before she was referred to the OIG.  (Jenkins Dep. at 25; McHale Dep. at 50, Ex. 7.)  In light of this evidence,

there is no basis to permit a jury to conclude that Mr. Jenkins is lying about his understanding

that Ms. Brown's behavior was a matter of concern.[8]  *Brady*, 520 F.3d at 495.

### e.   Ms. Hudson

Ms. Brown argues that Ms. Hudson "had no reasonable basis to assert that Plaintiff let

Mr. Baker into the building."  (Pl.'s Opp'n at 7.)  Yet, Ms. Hudson testified that she believed Ms.

Brown to be involved with Mr. Baker's appearance in her office because her secretary "told [her]

specifically that [Ms. Brown] had attempted to get in touch with [her], and that she had a visitor

or someone who wanted to speak to [her]" shortly before Mr. Baker arrived.  (Hudson Dep. at

58.)  And Ms. Brown concedes that she in fact did place a call to Ms. Hudson's secretary to tell

her that Mr. Baker "would be coming by" and therefore was involved with Mr. Baker's visit.

(Brown Dep. at 61.)  Plaintiff has adduced no evidence to suggest that Ms. Hudson was not

genuinely concerned about the situation with Mr. Baker and told Agent Bacon about her

suspicion of plaintiff because she perceived a connection between Mr. Baker and Ms. Brown—a

connection Ms. Brown admits existed.  (*Id.*)  Ms. Brown's contention that Ms. Hudson had "zero

substantial evidence" and that her referral of plaintiff to the OIG "was based on suspicions" does

---

[8] As with Ms. Hontz, plaintiff presents no evidence to support her allegation that Mr. Jenkins wanted to retaliate against her for her complaints against Mr. Whitmore.  Plaintiff alleges that Mr. Jenkins "had worked with John Whitmore and had participated, on behalf of management, in the process of attempting to resolve the prior EEOC claims of Plaintiff."  (Compl. ¶ 18.) However, mere knowledge of Ms. Brown's protected acts is not sufficient to allow a jury to infer that Mr. Jenkins' acts were motivated by retaliation.  *See*, *e.g.*, *Barry v. U.S. Capitol Guide Bd.*, 636 F. Supp. 2d 95, 106-07 (D.D.C. 2009) ("[T] o defeat a motion for summary judgment, the plaintiff must submit proof beyond mere knowledge about protected activity and speculation that [defendant] harbored retaliatory animus against the plaintiff because '[c]onclusory allegations unsupported by factual data [do] not create a triable issue of fact.'") (quoting *Exxon Corp. v. F.T.C.*, 663 F.2d 120, 126-27 (D.C. Cir. 1980)).  Plaintiff presents no evidence, direct or circumstantial, that Mr. Jenkins desired to retaliate against her, and Mr. Jenkins testified that he has spoken with Mr. Whitmore only once since his retirement in 2004 and that he has never spoken to Mr. Whitmore regarding Ms. Brown.  (Jenkins Aff. ¶¶ 4-5.)  On the basis of such evidence, a reasonable jury could not infer a retaliatory motive on the part of Mr. Jenkins.

not undermine the SBA's explanation for plaintiff's investigation, as the SBA reporting

regulation clearly states that SBA employees must report any irregularity "either actual or

suspected." 13 C.F.R. § 105.205. That Ms. Hudson's own investigation of Mr. Baker's

appearances at her office did not fully resolve the issue is immaterial to whether Ms. Hudson

suspected plaintiff's involvement and consequently reported her to OIG.

Ms. Brown then contends that Ms. Hudson waited six months to speak with OIG and did

so only "at the urging of Ms. Hontz and Mr. Jenkins." (Pl.'s Opp'n at 8-9.) Ms. Brown implies

that Ms. Hudson's delay in reporting plaintiff to the OIG undercuts her alleged concern over the

incident. However, Ms. Hudson stated that she decided to speak to the OIG once she became

aware of the media coverage of Mr. Baker and his criminal record, an awareness that increased

her concern regarding his visits. (Hudson Dep. at 14, 91, 96 ("[B]ased on that news coverage

regarding Mr. Baker, I felt compelled to go to the IG's office and speak to them directly about

my involvement with the protest.")). Plaintiff has adduced no evidence to contradict Ms.

Hudson's explanation, nor does she provide any evidence in support of her speculation that Ms.

Hudson referred Ms. Brown only "at the urging" of Ms. Hontz and Mr. Jenkins. Absent any

evidence to support her claims that Ms. Hudson was influenced by Ms. Hontz and Mr. Jenkins

for retaliatory reasons, plaintiff cannot meet her burden of persuading a jury that Ms. Hudson's

stated reason for reporting her to the OIG is a pretext. *Morgan*, 328 F.3d at 654.

### 2.   *The SBA's Arguments Are Unsupported By the Record*

Plaintiff attempts to show that the non-discriminatory reason for her investigation

proffered by the SBA is false by highlighting a number of alleged inconsistencies and

mischaracterizations in defendant's pleadings. (Pl.'s Opp'n at 12-14.) The Court finds that these

arguments are insufficient to persuade a reasonable jury that the SBA's stated reason for the

investigation—that its employees considered Ms. Brown's behavior "unusual" and reported it per SBA policy—is "unworthy of credence." *Desmond*, 530 F.3d at 962 (internal quotations omitted).  Four of Ms. Brown's points, however, bear further discussion.

Ms. Brown first takes issue with defendant's statement that Ms. Hontz received "numerous reports" from subordinates regarding Ms. Brown's "unusual" advocacy of SLT, arguing that at most she received reports of two incidents.  (Pl.'s Opp'n at 12.)  Yet, Ms. Hontz received a forwarded email chain from Mr. Collins, indicating that at least six SBA employees were contacted either by Ms. Brown regarding SLT or by one of their subordinates regarding Ms. Brown.  (Hudson Dep., Ex. 5.)  Ms. Hontz was also aware of Ms. Hudson's concerns that Ms. Brown was involved with Mr. Baker's entry to her office.  (Hontz Dep., Ex. 1 ¶ 9.)  The SBA's characterization of the seven employees contacted by or concerned with Ms. Brown as "numerous" is insufficient to persuade a reasonable jury that defendant's proffered non-discriminatory reason is false.

Ms. Brown then argues that the email chain received by Ms. Hontz regarding Ms. Brown's behavior also alleged "unusual" conduct by another SBA employee, Theodore Holloman.  (Pl.'s Opp'n at 12.)  Plaintiff maintains that Ms. Hontz's failure to refer Mr. Holloman to the OIG means that she "treated other employees . . . more favorably in the same factual circumstances" than she treated Ms. Brown and that she was not simply following SBA policy when she reported Ms. Brown.  *Brady*, 520 F.3d at 495.  However, the record belies Ms. Brown's assertions.  Nowhere in the email referenced by Ms. Brown are Mr. Holloman's actions described as "unusual," nor is there any indication that Mr. Holloman was a PCR or behaved in a similar manner to Ms. Brown.  (Hudson Dep., Ex. 5 at 1.)  Rather, the email states that Mr. Holloman spoke with Mr. McHale and reported a call he received from Ms. Brown regarding

SLT.  Indeed, Mr. Holloman appears to have acted consistently with the other SBA employees who felt that Ms. Brown's conduct was abnormal.  There is nothing to indicate that Mr. McHale, Ms. Hontz, or any SBA employee believed that Mr. Holloman, in discussing Ms. Brown's behavior with Mr. McHale, acted unusually.

Plaintiff suggests that Ms. Hontz had "contradictory reports from three different individuals as to the 'unusual' nature of Plaintiff's contact to the HUBZone office" and that the "inconsistency of Ms. Hontz, Mr. Jenkins, Mr. McHale, and Mr. Caulfield [*sic*] explanations as to Ms. Brown's actions is sufficient to create a genuine dispute of material fact."  (Pl's Opp'n 13.)  The Court disagrees.  It is unclear as to what "inconsistency" Ms. Brown refers, since she fails to provide any cites to the record.  However, the evidence shows that Mr. Jenkins, Mr. McHale, Ms. Hontz, and Mr. Caulfield all believed that Ms. Brown's contact with the HUBZone Office was "unusual."  (McHale Dep. at 18; Hontz Dep., Ex. 1 ¶¶ 9, 15; Caulfield Dep. at 34.)  This evidence is consistent with the SBA's position that its employees believed Ms. Brown's behavior to be abnormal and reported it as such.

Finally, Ms. Brown attacks the SBA's characterization of Ms. Hudson's referral of Ms. Brown to the OIG as "reasonable" because the OIG investigation produced "zero evidence that Ms. Brown assisted Mr. Baker into the SBA Headquarters and is based on the assumption that because Ms. Brown and Mr. Baker are two African Americans they must be 'acquaintances' and accomplices."  (Pl.'s Opp'n at 14.)  While "an error too obvious to be unintentional" might show that Ms. Hudson's stated reason for reporting plaintiff is false, *Fischbach*, 86 F.3d at 1183, that is not the case here.  To the contrary, the OIG investigation established that Ms. Brown actively assisted Mr. Baker in entering the SBA building, as plaintiff admitted during her interview with Agent Bacon that she "did call and ask someone to allow Baker into the building."  (Brown Dep.,

Ex. 5 at 2.)  Ms. Hudson's suspicions that Ms. Brown was somehow involved with Mr. Baker's entry to her office were thus confirmed.  As such, the results of the OIG investigation fail to support plaintiff's argument that Ms. Hudson's concerns about Ms. Brown were unfounded or racially motivated.

### 3.   Mr. Jenkin's Request For a Continuation of the OIG Investigation

Ms. Brown next argues that a jury could find that Mr. Jenkins' proffered explanation for his request that the OIG continue its investigation of plaintiff was false.  (Pl.'s Opp'n at 15.)  As described above, Mr. Jenkins suggested that the initial memorandum to file authored by Agent Bacon was an "incomplete review of the facts" because "[i]nterviews were not conducted with staff in the Office of HUBZone or Washington District Office" and "it [was] unclear if Lara Hudson was contacted for this review."  (Jenkins Dep., Ex. 4.)  Ms. Brown contends that the "initial report clearly stated that Agent Bacon had obtained a statement and information from Ms. Hudson" and that this undermines Mr. Jenkins' non-retaliatory explanation for the continued investigation.  (Pl.'s Opp'n at 15.)

Ms. Brown is correct that the ROI authored by Agent Bacon and dated July 25, 2006, indicates that Ms. Hudson was interviewed by the OIG in connection with Ms. Brown's review. (Jenkins Dep., Ex. 5.)  However, Mr. Jenkins requested the continuation of Ms. Brown's investigation a month earlier, on June 23, 2006, based only on his review of Agent Bacon's interview of Ms. Brown.  (Jenkins Dep., Ex. 4.)  On June 19, 2006, Agent Bacon sent Mr. Jenkins the "Memorandum of Interview for Malda Brown,"[9] which he stated was "conducted as

---

[9] The Brown Memorandum of Interview was "initially prepared as a Memo to the File" and was "transferred without modification" on July 3, 2006, to the form in which it was presented to the Court.  (Brown Dep., Ex. 5 at 2.)  Mr. Jenkins' discussion of the "memo to file" in his email to Agent Bacon thus refers to the Brown Memorandum of Interview.  (Jenkins Dep., Ex. 4.)

a result of information provided to us by Lara Hudson of OGC." (*Id.*)  Nothing in this email, or

in the Memorandum of Interview of Ms. Brown, states that Ms. Hudson was contacted pursuant

to the OIG's review of Ms. Brown's case.  Agent Bacon notes only that the review was initiated

based on information from Ms. Hudson, not that she had been interviewed. (*Id.*)  As such, Mr.

Jenkins' statement that "it [was] unclear if Lara Hudson was contacted" for the review is not

obviously contradicted by the information in his possession at the time he requested the

continued investigation.  Accordingly, there is no evidence to permit a jury to find that Mr.

Jenkins' proffered reason for his demand for further review was untrue or the result of retaliatory

intent.

### 4.  *Ms. Brown's Verbal Instruction*

Ms. Brown asserts that a jury could find that the verbal instruction plaintiff received was

the "product of discriminatory animus" because the OIG investigation "found no reasonable

basis to conclude Ms. Brown was involved in assisting Mr. Baker into the building."[10]  Yet, as

---

[10]  Ms. Brown also asserts that a jury could find the instruction to be retaliatory because it was
given to her a mere six weeks after she gave notice to the EEO office of the retaliation claim at
issue in this case.  (Pl.'s Opp'n at 17.)  Ms. Brown did not raise this claim in her complaint.
Rather, she stated that the OIG investigation was "a direct and proximate result of filing prior
EEO complaints of discrimination and a direct and proximate result of having had to settle the
previous EEO complaints with plaintiff."  (Compl. ¶ 32.)  Ms. Brown's complaint makes no
mention of the verbal instruction, and there is no suggestion that any part of the investigation or
the instruction resulted from Ms. Brown's EEO office contact regarding the instant case.  Given
that plaintiff's opposition is the first mention of this claim and there is no indication that Ms.
Brown exhausted her administrative remedies with respect to this allegation or that discovery
was conducted on this issue, the Court declines to consider Ms. Brown's verbal instruction as a
separate claim of retaliation at this stage.  *See Dickerson v. SecTek, Inc.*, 238 F. Supp. 2d 66, 83
(D.D.C. 2002) ("An opposition to a summary judgment motion is not the place for a plaintiff to
raise new claims."); *see also Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 113 (2002)
("Each discrete discriminatory act starts a new clock for filing charges alleging that act" and
"[t]he charge, therefore, must be filed within the 180- or 300-day time period after the discrete
discriminatory act occurred."); *Jarrell v. U.S. Postal Serv.*, 753 F.2d 1088, 1091 (D.C. Cir. 1985)
("[A] timely administrative charge is a prerequisite to initiation of a Title VII action in the
District Court.").  The Court considers the verbal instruction only to the extent it can be regarded

discussed, the OIG investigation concluded, and Ms. Brown admitted in her deposition, that she

"made a phone call and told [Ms. Green] that [Mr. Baker] would be coming by to try to drop off

a package." (Brown Dep. at 61.)  It was this very conduct that Ms. Gentile asked Ms. Anderson

to address. (Gentile Dep., Ex. 2 ("[P]lease give Malda Brown verbal instruction that she should

not have contacted SBA Headquarters staff to request assistance in providing Mr. Baker . . .

access to the SBA Headquarters building if she had not planned to accompany him[.]"); *see also*

Jenkins Dep. at 20-21 ("I basically told [Ms. Gentile] that she needed to contact Malda's

supervisor to have her instruct Malda that under no circumstance in the future is she to let

someone gain access to our secure space unless she's the person receiving them.")  There is no

inconsistency between the evidence adduced during the OIG investigation and the instruction

provided to Ms. Brown.  There is simply no basis to allow a jury to conclude that the SBA is

"lying" about why it felt it necessary to instruct Ms. Brown as to SBA procedures regarding

visitors, given Ms. Brown's admission. *Brady*, 520 F.3d at 495.


## CONCLUSION

For the foregoing reasons, the Court grants defendant's motion for summary judgment.

A separate Order will accompany this Memorandum Opinion.


_____/s/_____<br>
ELLEN SEGAL HUVELLE<br>
United States District Judge

DATE:  December 16, 2009

---

as part of the overall OIG investigation.  However, even if Ms. Brown's claim with respect to the instruction had been asserted in a timely manner, it could not survive summary judgment.  As the Court concluded above, the verbal instruction given to Ms. Brown did not constitute an adverse employment action. Therefore, that action could not have served as the basis for a retaliation claim.